## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHELLE B.[1], | : | |
| Plaintiff, | : | CIVIL ACTION |
| v. | : | No. 23-4018 |
| | : | |
| LELAND DUDEK, | : | |
| Acting Commissioner of | : | |
| Social Security, | : | |
| Defendant. | : | |

## MEMORANDUM

**JOSÉ RAÚL ARTEAGA**                                         **March 7, 2025**
**United States Magistrate Judge[2]**

The Commissioner of the Social Security Administration, through an Administrative Law Judge ("ALJ"), denied Michelle B.'s application for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383. Michelle B. seeks judicial review of the final administrative decision pursuant to 42 U.S.C.

---

[1] Michelle B. is referred to solely by her first name and last initial in accordance with this Court's standing order addressing party identification in social security cases. *See* Standing Order, *In re*: Party Identification in Social Security Cases (E.D. Pa. June 10, 2024),
https://www.paed.uscourts.gov/sites/paed/files/documents/locrules/standord/SO_pty-id-ss.pdf (last visited Feb. 25, 2025).

[2] The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings, including the entry of a final judgment, pursuant to 28 U.S.C. § 636(c). (ECF 17.)

§ 405(g) and 1383(c)(3)[3] and asks the Court to reverse and remand the Commissioner's decision.

After careful review of the record, Michelle B.'s request for review is DENIED, and the Commissioner's decision is AFFIRMED.

## I.    BACKGROUND

Michelle B. filed for SSI on June 29, 2021, alleging disability based on lupus, osteoarthritis in her knee and back, herniated disc, sciatica, edema, high blood pressure, depression, and anxiety disorder.[4]  (Tr. 90.)  At the time of her application, she was 49 years old, defined as a younger individual, but she subsequently changed age category to closely approaching advanced age.  (Tr. 35 (citing 20 C.F.R. § 416.963).)  Her claims were denied, and she timely filed a hearing request.  (Tr. 110, 123, 125.)  ALJ Lisa B. Parrish held a hearing on July 13, 2022.  (Tr. 165.)  Michelle B. and the Agency's Vocational Expert ("VE") Gina Baldwin testified at the hearing, which was held by telephone due to the COVID-19 pandemic.  (Tr. 42-43, 180.)  An attorney represented Michelle B.  (Tr. 43-44.)

---

[3] 42 U.S.C. § 1383(c)(3) renders the judicial review provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.

[4] She alleged an earlier disability onset date (May 15, 2019) but SSI is payable only after the filing date unless the ALJ reopens a previous claim.  (Tr. 24-25 (citing 20 C.F.R. § 416.335).)  June 29, 2021 begins the relevant period because the ALJ did not open a previous claim and Michelle B. does not challenge that date (Tr. 24-26.)  To the extent the ALJ's decision discusses evidence from before then, discussion was "limited to the purpose of providing a foundation to consider [Michelle B.'s] alleged impairments and limitations with the consistency of the medical evidence." (Tr. 24.)

On August 11, 2022, the ALJ found Michelle B. not disabled under the Social Security Act. (*See* Tr. 21-36.) The ALJ determined that Michelle B. had the residual functional capacity ("RFC") to perform "light work as defined in 20 C.F.R. § 416.967(b) except [she] can occasionally perform postural activities, but no climbing ladders, ropes, or scaffolds; [may] frequently perform manipulative movements with left, dominant, upper extremity; and occasionally operate foot controls bilaterally; and cannot work in an environment with concentrated vibration, heights, or hazards." (Tr. 29.)  She found that Michelle B.'s RFC precluded her past relevant work as a home health aide.  (Tr. 34.) Still, the ALJ found jobs that existed in significant numbers in the national economy that she could have performed.  (Tr. 35.)  The VE testified that Michelle B. "would have been able to perform the requirements of representative occupations such as a sorter . . . , garment bagger . . ., and garment stringer."  (*Id*.)  Based on the VE's testimony, the ALJ concluded that Michelle B. was not disabled because she was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy."  (Tr. 36.)

Michelle B. asked the Appeals Council to review this decision but on August 30, 2023, the Appeals Council denied her request. (Tr. 1-6.) The ALJ's August 11, 2022 decision then became the Commissioner's final act.  On appeal here, Michelle B. argues the ALJ committed reversible error by: (1) finding that her anxiety and depression were not severe impairments at step two; (2) finding that her "ambulation difficulties" would not last for a twelve-month duration in determining the RFC; and (3) failing to develop the record.  (*See generally*, ECF 12.)

## II.    LEGAL STANDARDS

Working through ALJs, the Commissioner follows a five-step sequential evaluation process in determining whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 416.920(a).  The Commissioner determines whether the claimant: (1) is engaged in substantial gainful activity; (2) has a severe impairment;[5] (3) has impairment(s) that meet or medically equal a listed impairment;[6] (4) has the capacity to do past relevant work, considering her RFC[7]; and (5) is able to do any other work, considering her RFC, age, education, and work experience. *Id.*

Where mental impairments are at issue, the five-step analysis includes additional inquiries.  20 C.F.R. § 416.920a(a).  In step two, the ALJ decides whether the claimant has any "medically determinable impairment(s)." *Id.* § 416.920a(b)(1).  Then, the ALJ determines "the degree of functional limitation resulting from the impairment(s)." *Id.* § 416.920a(b)(2); *see id.* § 416.920a(d) (explaining that the ALJ uses the degree of functional limitation in determining the severity of the claimant's mental impairments).  The ALJ

---

[5] A "severe impairment" is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 416.920(c).

[6] An extensive list of impairments that warrant a finding of disability based solely on medical criteria, without considering vocational criteria, is set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1.

[7] "Residual functional capacity" is the most a claimant can do in a work setting despite the physical and mental limitations of his or her impairment(s) and any related symptoms (*e.g.*, pain). 20 C.F.R. § 416.945(a)(1). In assessing a claimant's RFC, the Commissioner considers all medically determinable impairments, including those that are not severe. *Id.* § 416.945(a)(2).

4

rates the claimant's degree of limitation in "four broad functional areas" known as the "Paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* § 416.920a(c)(3); 20 C.F.R. Pt. 404, Subpt. P, App'x 1 (Listings). The degree of limitation is rated on a five-point scale: none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.920a(c)(4).

The burden of proof is on the claimant at all steps except step five. *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010). At step five, "the burden of production shifts to the Commissioner, who must . . . show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Fargnoli v. Massanari*, 247 F.3d 34, 39 (3d Cir. 2001).

The Social Security Act requires an ALJ to state the "reason or reasons upon which [a denial of benefits] is based." 42 U.S.C. § 405(b)(1). An ALJ "may consider many factors" when determining the reason or reasons for their decision, "yet base a decision on just one or two" factors. *Zaborowski v. Comm'r of Soc. Sec.*, 115 F.4th 637, 639 (3d Cir. 2024). ALJs must "explain only the dispositive reasons for their decisions, not everything else that they considered." *Id.* Said otherwise, ALJs "must always explain the reasons for their decisions. But that does not mean always explaining all the factors." *Id.* The ALJ's opinion need only include "sufficient development of the record and explanation of findings to permit meaningful judicial review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d

Cir. 2004) (citation omitted). The Court reads the ALJ's decision "as a whole" to determine whether the record was sufficiently developed. *Id.*

Any legal issues the ALJ decides are subject to the Court's "plenary review." *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). This Court's review of the Commissioner's final decision is limited to the question of whether the ALJ's findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g); *Johnson*, 529 F.3d at 200. "[T]he threshold for such evidentiary sufficiency is not high . . . ." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (citation omitted). It is "more than a mere scintilla but may be somewhat less than a preponderance of evidence." *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). A "single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983).

Where substantial evidence supports the Commissioner's findings, courts may not "re-weigh the evidence or impose their own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). Courts defer to the ALJ's assessment of the evidence, which will not be undermined by contrary evidence so long as the ALJ "explain[s] what evidence he [or she] found not credible and why." *Zirnsak v. Colvin*, 777 F.3d 607, 612 (3d Cir. 2014) (citation omitted). In other words, reviewing courts must affirm the Commissioner if substantial evidence supports his decision, even if they would

6

have decided the case differently. *See Fargnoli*, 247 F.3d at 38. The Court cannot substitute its own judgment for that of the factfinder. *Zirnsak*, 777 F.3d at 611 (citation omitted). Therefore, the question before this Court is not whether Michelle B. is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached upon a correct application of the law.

## III.    DISCUSSION

Mindful of the threshold for substantial evidence—"only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" a review of the record demonstrates that substantial evidence supports the Commissioner's determinations and remand is not required. *Biestek*, 587 U.S. at 103.

### A.    <u>Substantial Evidence Supports the ALJ's Step Two Findings.</u>

Michelle B. contends that the ALJ erred in finding, at step two, that she did not have a severe mental health impairment.[8] (ECF 12 at 6.) Specifically, Michelle B. argues

---

[8] Throughout her brief, Michelle B. refers to her alleged mental health impairment either generally, as "mental health condition(s)," or as "depressive and anxiety disorder" or "depression/anxiety." (ECF 12 at 6-10.) However, "Depressive Disorders", which fall under "Mood Disorders" in the DSM, are distinct from "Anxiety Disorders." *See Diagnostic and Statistical Manual of Mental Disorders*, 345, 429 (4th ed. rev. 2000). Even so, any error at the second step of the sequential evaluation is harmless provided the ALJ determines that one of the claimant's impairments is severe, which the ALJ did here, so the distinction is not outcome determinative. *See Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 144-45 & n.2 (3d Cir. 2007).

The ALJ referred to Michelle B.'s alleged mental impairment as "depression/anxiety," (Tr. 27), so the Court does the same in this opinion.

that substantial evidence does not support the ALJ's finding that her "depressive and anxiety disorder" is not a severe impairment. (*Id.*) Her arguments are not well taken.

At step two of the sequential analysis, a claimant bears the burden of proving that she suffers from "a medically severe impairment or combination of impairments." *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). An impairment is not severe if it does not significantly limit or has only a minimal effect on a claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 416.921(a). The step two inquiry is "a *de minimis* screening device to dispose of groundless claims." *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003). The burden placed on a claimant at this stage is not an exacting one. *See McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). However, a denial at step two, "like one made at any other step in the sequential analysis, is to be upheld if supported by substantial evidence on the record as a whole." *Id.* at 360-61 (citation omitted).

Nevertheless, even if the ALJ erroneously determines at step two that an impairment is not severe, the ALJ's ultimate decision may still be based on substantial evidence if the ALJ considered the effects of that impairment in crafting the RFC. The analysis at step two is "wholly independent" of the analysis at later steps, and thus "not finding certain impairments severe at step two does not affect the ultimate disability determination." *Alvarado v. Colvin*, 147 F. Supp. 3d 297, 311 (E.D. Pa. 2015); *see Salles v. Comm'r of Soc. Sec.*, 229 F. App'x 140, 145 n.2 (3d Cir. 2007) ("Because the ALJ found in [claimant's] favor at Step Two, even if he had erroneously concluded that some of her other impairments were non-severe, any error was harmless." (citing *Rutherford*, 399 F.3d

at 553)); *see also Orr v. Comm'r of Soc. Sec.*, 805 F. App'x 85, 88 (3d Cir. 2020) ("[B]ecause the ALJ progressed to a later step, any error at Step Two would not alter that remainder of the five-step process, much less the overall outcome."). Therefore, failing to find an impairment to be severe is a harmless error when the ALJ does not deny benefits at this stage and properly considers the condition in the remaining analysis.

Here, the ALJ decided in Michelle B.'s favor at step two, finding that her degenerative joint disease of the knees, degenerative disc disease with L5-S1 radiculopathy, and opioid abuse are severe. (Tr. 26.) The ALJ also explained why she found that Michelle B. only had "mild" limitations in the four broad areas of mental functioning and, thus, why her medically determinable mental impairment of "depression/anxiety" was not severe. (Tr. 27.) The ALJ first summarized her finding that Michelle B.'s mental impairment was not severe by citing her conservative and inconsistent treatment, lack of individual therapy sessions for mental symptoms, and lack of hospitalization or intensive outpatient treatment outside of her treatment for substance abuse. (*Id.*) She then evaluated the severity of Michelle B.'s mental limitations using the "Paragraph B" criteria—with references to the record—and explained that Michelle B. has "no limitations" in the functional areas of (1) understanding, remembering, or applying information; (2) interacting with others; and (3) ability to concentrate, persist, and maintain pace. (Tr. 27 (citing Tr. 1733-35, 1897-1905)); *see* 20 C.F.R. § 416.920a(c)(3). The ALJ found that Michelle B. could attend weekly doctor's appointments, provide information about her health, respond to questions from medical providers, and manage her funds and her own medical care. (Tr. 27 (citing Tr. 529-1680, 1727-77, 1778-1872, 1873-

2047, 2048-2324).)  She noted that Michelle B. also had no limitations in spending time with friends and family, living with others, and interacting with hospital staff and medical providers.  (*Id.*)  The ALJ also found that Michelle B. has "mild limitations" in her ability to adapt or manage herself, as she could handle self-care and personal hygiene and could care for her teenage son.  (*Id.*)  She then concluded that because Michelle B. had no more than "mild" limitations in any of the functional areas and the evidence "[did] not otherwise indicate" more than a minimal limitation, Michelle B.'s "depression/anxiety" was non-severe.  (*Id.*)

The ALJ continued to consider Michelle B.'s alleged depression/anxiety in determining her RFC at step four, acknowledging her obligation to "consider all of the claimant's impairments, including impairments that are not severe." (Tr. 26 (citing 20 C.F.R. §§ 416.920(e) and 416.945).) Because the ALJ proceeded beyond the sequential evaluation's second step and considered limitations, or lack thereof, imposed by Michelle B.'s mental impairment in crafting the RFC, any error in categorizing Michelle B.'s mental impairment as not severe is harmless.  *See Salles*, 229 F. App'x at 145 n.2 (citing *Rutherford*, 399 F.3d at 552-53).

Even so, Michelle B. has not shown that the ALJ did not adequately consider the evidence relating to her depression/anxiety. The ALJ discussed Michelle B.'s conservative and inconsistent treatment throughout her opinion, explaining that Michelle B. has not attended individual therapy sessions or required any hospitalization or outpatient treatment other than her substance abuse treatment.  (Tr. 27, 34.)  Although Michelle B. testified that she had been recently referred to behavioral health before the

hearing,[9]—the record also reflects multiple previous referrals that she did not pursue. Michelle B. reported feeling depressed and/or anxious at multiple appointments with her primary care practitioner but repeatedly declined referrals for behavioral health and therapy.  (Tr. 643, 653, 772.)  In addition, when asked about behavioral health care by another provider, Michelle B. stated that she "prefers to put [p]sych on hold until social security issues are fixed."  (Tr. 686.)  It does not appear that Michelle B. sought any other outpatient mental health treatment, despite seeking treatment for physical symptoms. (Tr. 30-31, 643, 653); *see* SSR 16-3P (explaining that an ALJ may consider if the frequency and/or extent of treatment sought is not comparable with a claimant's subjective complaints).

In the same vein, the ALJ discussed Michelle B.'s lack of compliance with her substance abuse treatment.  (Tr. 31, 33.)  From October 7, 2020, to October 12, 2020, Michelle B. received inpatient care for rehabilitation and detox, where she reported using heroin and benzodiazepines.  (Tr. 31, 612.)  The hospital intake record shows that Michelle B. reported "feeling depressed and anxious as a **result** of her relapse . . . ."  (Tr. 612) (emphasis in original). Medical staff noted that she had a "broad differential" as to possible diagnoses given self-reported symptoms, clinical presentation, and possible complications from her history of substance abuse.  (Tr. 586.)  Michelle B. left inpatient rehab on her own and subsequently underwent suboxone clinic intake.  However, she

---

[9] Michelle B. inaccurately states the ALJ did not reference this referral in her decision.  (ECF 12 at 7.)  Not so. (*See* Tr. 30.)

did not adhere to suboxone treatment and continued to use other illicit drugs, including fentanyl, heroin, cocaine, benzodiazepine, and marijuana. (*See, e.g.*, Tr. 549, 553, 568-69, 609, 612, 634, 1896, 2053.) When her primary care physician inquired about more treatment options, Michelle B. stated that inpatient rehab wasn't "realistic", and that she did not "want" to try a methadone program. (Tr. 535.) In December 2021, Michelle B. again underwent suboxone clinic intake, where she reported that she had been on and off suboxone for three years and that she was using "1 bag" a week. (Tr. 33, 1733.) Again, she did not adhere to the treatment. Moreover, when she was hospitalized for a physical complaint in June 2022, Michelle B. left the hospital after one day because she was beginning to withdraw from opiates (fentanyl and oxycodone) and was too uncomfortable to stay. (Tr. 1896, 1905.) Hospital records show that she was referred to mental health services but elected to leave before receiving any information on how to contact them. (*Id.*) Michelle B. also testified that she continued to use illicit drugs up until the day before her hearing. (Tr. 62.) In her brief, Michelle B. notes that mental illness can contribute to an individual's noncompliance with treatment. (ECF 12 at 8.) However, there is no evidence that this occurred in the current case.

The ALJ also pointed out the lack of evidence of mental abnormalities in the record, along with Michelle B.'s testimony that she only used standard psychiatric medications prescribed by her primary care practitioner, Dr. Judy Chertok. (Tr. 30, 61.) Records from Dr. Chertok's office show that Michelle B. was prescribed Lexapro and Seroquel for depression and anxiety but that she did not report any functional limitations or specific symptoms related to mental impairments. (Tr. 1733-35.) In July 2021, Michelle

B. reported to Dr. Chertok that she was not taking her prescribed medications "at all" and was instead using opiates, cocaine, and Xanax. (Tr. 535.) During this encounter, Dr. Chertok observed Michelle B. to be "pleasant" and "not audibly anxious" with a "normal affect." (*Id.*) In October and November 2021, Dr. Chertok's staff reported that Michelle B. was not taking her medications, although she stated during a December 2021 telephone call that she had restarted antidepressant medications. (Tr. 1737-39.) The ALJ also noted that when Michelle B. was hospitalized in June 2022, she saw a family medicine provider who noted that she was prescribed medication for depression and anxiety but did not observe any mental abnormalities. (Tr. 1901-05.) Michelle B. told that provider that she was not taking her Seroquel as prescribed. (Tr. 1903.) When the ALJ asked her to explain why she was disabled, Michelle B. first only described physical symptoms and issues. (*See* Tr. 52-60.) Then, once asked if there was "anything else," Michelle B. said, "[t]he mental piece, it's a lot of things going on mentally . . . and depression." (Tr. 61.) She did not elaborate further or explain any limitations or symptoms resulting from "[t]he mental piece." (*Id.*)

Additionally, the ALJ explained that the RFC determination is supported by the fact that "[Michelle B.'s] treating physicians have not assigned her any specific long-term limitations" due to her mental impairments. (Tr. 34.) Michelle B. contends that the state agency consultants' findings that depression and anxiety were severe (Tr. 87, 92) undercuts the ALJ's determination, but the ALJ properly found those findings "not persuasive." (*Id.*, ECF 12 at 9.) The ALJ acknowledged that at both the initial and reconsideration disability determination levels, the state agency consultants indicated

that the evidence was insufficient to "rate limitations of any impairment, symptoms, or alleged limitations," but explained that the evidence received at the hearing level was "sufficient to make the necessary determinations." (Tr. 34, 87, 92.) The state agency consultants reviewed less evidence than the ALJ and did not have the benefit of the evidence submitted at the hearing level.  It is well-established that, although ALJs must consider the findings of state agency physicians and psychologists as opinion evidence, they are not bound by their opinions. *See Brown v. Astrue*, 649 F.3d 193, 196-97 (3d Cir. 2011) (holding that an ALJ is entitled "to weigh all evidence" even when there is record evidence from a physician "suggesting a contrary conclusion"). Further, the state agency findings are inconsistent, as they purport to find that certain impairments are severe while also stating that there is insufficient evidence to make a disability determination. The state agency findings also lack any explanation as to why said impairments are severe. (Tr. 85-94.)

In sum, although the ALJ concluded at step two—with references to the record—that Michelle B.'s mental impairment was not severe, (Tr. 27), the ALJ still went on to consider the mental impairment and any alleged limitations flowing from it.  She also explained why the mental impairment warranted no functional limitations in the RFC. Thus, any error with respect to evaluation of the severity of Michelle B.'s mental impairment at step two was harmless and provides "no valid basis for remand." *See Orr*, 805 F. App'x at 88.  Moreover, there is "such relevant evidence as a reasonable mind might accept as adequate to support" the ALJ's determination, and the Court may not re-

weigh it to find otherwise.  *Biestek*, 587 U.S. at 103 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

### B.    Substantial Evidence Supports the Physical RFC.

Michelle B. argues that the ALJ erred in finding that she had the physical RFC to perform "light exertional work[10]." (ECF 12 at 13.)  Specifically, she contends that the ALJ erred in determining that she would not "continue to need ambulatory aids[,]" *i.e.*, a cane or walker, for twelve months.  (ECF 14 at 6.)  She claims that because there is no evidence regarding her ability to ambulate following her June 2022 hospitalization, substantial evidence does not support the ALJ's physical RFC finding.  That is not so.

The RFC is the most a claimant can do in a work setting despite her limitations.  20 C.F.R. § 416.945(a)(1).  "The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler*, 667 F.3d at 361.  The ALJ must consider all relevant evidence in formulating the RFC, and the RFC must "be accompanied by a clear and satisfactory explication of the basis on which it rests." *Fargnoli*, 247 F.3d at 41 (quoting *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981)). The ALJ must include in the RFC any credibly established limitations supported by the record. *Zirnsak*, 777 F.3d at 614 (citing *Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999)).

---

[10] The regulations define "light work" as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. 20 C.F.R. § 416.967(b).  A job is in this category when it "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Id.*

The ALJ is not, however, required to account for the use of a hand-held assistive device such as a walker or cane in the RFC if the device is not "medically necessary." *Mundo v. Kijakazi*, No. 21-cv-517, 2023 WL 2632810, at *4 (M.D. Pa. Mar. 24, 2023) (citation omitted). To establish that a hand-held device is medically required, there must be *medical evidence* documenting both the need for the device to aid in walking and standing and the circumstances under which the device is required. *See* SSR 96-9p, 1996 WL 374185, at *7. A prescription for an assistive device with "no discussion of its medical necessity" is "insufficient to support a finding that [an assistive device] was medically necessary." *Howze v. Barnhart*, 53 F. App'x 218, 222 (3d Cir. 2002) (holding that there was insufficient evidence that a cane was medically necessary where there were references to the claimant using one, but the only proof that he required it for ambulation were a prescription and a checked box on a report). Here, after "careful consideration of the evidence," the ALJ found that "the objective medical evidence and treatment history" was inconsistent with Michelle B.'s alleged ambulatory limitations. (Tr. 31.)

Contrary to Michelle B.'s argument that the ALJ needed evidence "from a medical professional commenting on the ongoing status of [her] ambulation, "[t]here is no legal requirement that a physician [make] the particular findings that an ALJ adopts in the course of determining an RFC." *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006). The ALJ must survey the medical evidence to craft the RFC, which is exactly what the ALJ did here. *See id.* The ALJ acknowledged that before Michelle B. left the hospital in June 2022 due to opiate withdrawal, she was given a walker and a cane due to her complaints of sciatica and falling. (Tr. 31, 1925.) However, the ALJ explained that "no

16

objective diagnostic medical evidence supports her allegations that she now requires a walker/cane" when she "could ambulate effectively without a medically required hand-held assistive device until June 2022." (Tr. 33.) Beyond the notation that Michelle B. was given a walker and the observation that she previously "worked with physical therapy who recommended she use a walker," the hospital record is devoid of any discussion of why the walker was necessary and under what circumstances Michelle B. would need it. (*See generally*, Tr. 1876-2034.)

Michelle B. testified, vaguely, that her physical therapist previously gave her a cane that broke when she fell, although there is no record of a prescription for one.[11]  In addition, doctors observed that she "ambulate[d] independently" without an assistive device at home and did not have an impaired gait. (Tr. 1884, 1892, 1894.) The ALJ noted that x-rays of Michelle B.'s knees showed only mild joint space narrowing with normal alignment and no effusion, and that doctors observed that she had full strength in her legs. (Tr. 33, 1882, 1945.) The ALJ also considered Michelle B.'s testimony that, prior to June 2022, she frequently used stairs to navigate three levels of her home. (Tr. 30, 50, 63.) No additional record evidence addresses possible restrictions with walking. Without more, Michelle B. cannot show that an assistive device was medically necessary such that that the ALJ was required to consider the use of one in determining her the RFC. *See Howze*, 53 F. App'x at 222.

---

[11] Michelle B.'s available physical/occupational therapy records do not include a prescription for or discussion of a cane.  (*See* Tr. 1778-1872.)

Moreover, the ALJ properly considered Michelle B.'s history of complaints of orthopedic pain and alleged restrictions in her movement and found them inconsistent with the objective medical evidence. (Tr. 31.) The ALJ noted that, in March 2021, Michelle B. presented to the emergency department with complaints of knee, low back, and left shoulder pain. (Tr. 31-32.) Doctors observed no evidence of difficulty walking and marked that she was "negative for [a] gait problem." (Tr. 553-54.) Michelle B. was given a lidocaine patch and topical Lidoderm and advised to follow up with other specialists. (Tr. 31-32, 547.) The ALJ explained that Michelle B. then underwent consultation for bilateral knee pain, where the examining physician noted "mild crepitus" and "moderate tenderness" in the right knee and "tenderness to palpation in the left knee." (Tr. 32, 544-45.) X-rays showed "moderate right and mild left knee osteoarthritis," and she was given bilateral corticosteroid injections. (Tr. 32, 545); *see Sudler v. Comm'r of Soc. Sec.*, 827 F. App'x 241, 245 (3d Cir. 2020) (noting injections constitute conservative treatment).

Michelle B. presented to the emergency department again in April 2021, complaining of "left shoulder pain, right-sided rib pain, bilateral knee pain, [and] right ankle pain" after slipping and falling. (Tr. 32, 540-41.) The ALJ emphasized that medical providers reported Michelle B. was "able to ambulate and walk prior to arrival," and that the examining physician observed Michelle B. "jump . . . in pain" before he touched her body and while his hand was "approximately 12 - 14 inches away." (Tr. 32, 539-40.) On exam, Michelle B. had tenderness over her left shoulder, knees, and right ankle but no decreased range of motion, and x-rays showed no "acute abnormalities" other than mild osteoarthritis in her knee. (Tr. 540.) Similarly, a May 2021 chiropractic exam showed

some tenderness and decreased range of motion but no abnormality or difficulty walking. (Tr. 32, 1817.)  An August 2021 MRI showed minor findings that were described as only "diffuse" and "marginal" at L5-S1 and "shallow broad disc bulging" at the L4-5, which was described as "current significance unclear."  (Tr. 1872.)

In June 2022, she had some tenderness and a positive right leg raise, but there was no indication of motor or sensory deficits, and x-rays showed "no significant interval change" from April 2021.  (Tr. 1881-82, 1912, 1913-14.)  The ALJ pointed out that hospital records stated that Michelle B. "ambulate[d] independently" without an assistive device at home and did not have an impaired gait.  (Tr. 1884, 1892, 1894, 1896.)  Medical providers also reported that Michelle B. "exercise[d] daily" via "stretches, walks, and dances." (Tr. 1898); *see Cunningham v. Comm'r of Soc. Sec.*, 507 F. App'x 111, 118 (3d Cir. 2012) ("[I]t is appropriate for an ALJ to consider the . . . type of activities in which a claimant engages when assessing his or her" RFC).

In fashioning the RFC, the ALJ also considered Michelle B.'s "gaps in treatment" and that she "received only minimal care when she sought treatment and had issues with treatment compliance."  (Tr. 33.)  Michelle B. began chiropractic therapy in May 2021 for reported "muscle spasms and muscle weakness . . . significant pain and stiffness in her neck, back, left shoulder, and right ankle . . . [and] pain that travels from her lower back down to both buttocks and down her right leg, with periods of numbness and tingling." (Tr. 1816.)  Notably, the record does not show any mention of knee pain or difficulty walking.  (*Id.*)  Providers described her treatment as "conservative chiropractic care with passive/active physiotherapy," which included mechanical traction, hydrobed therapy,

chiropractic adjustment, manual therapy, and therapeutic exercise. (Tr. 1818.) Significantly, records show that Michelle B. improved while undergoing this "conservative" chiropractic care, with observations of "reduced pain" in response to treatment, "stabilizing" progress, and "increased mobility." (Tr. 1820-35, 1871); *see Garrett v. Comm'r of Soc. Sec.*, 274 F. App'x 159, 164 (3d Cir. 2008) (affirming an ALJ's decision wherein conservative treatment contradicted the degree of symptom severity alleged by the claimant). She participated in chiropractic treatment until December 2021. (Tr. 32.)

The ALJ emphasized that Michelle B. did not seek treatment for her orthopedic complaints again until June 2022, when she was hospitalized due to complaints of "frequent falls, worsening sciatica since February 2022, and ambulatory dysfunction." (Tr. 33, citing Tr. 1905, 1910.) The ALJ also noted that there was "no extended workup for the [reported] falls[,]" such as an MRI or neurological evaluation, despite Michelle B.'s testimony about frequent falls beginning in February 2022. (Tr. 31, 57.) Further, during Michelle B.'s brief hospitalization, medical providers discussed possible referrals to the spine center and physical medicine and rehabilitation, and scheduled a follow up appointment for June 23, 2022, three days after discharge. (Tr. 1905, 1908.) However, there is no record evidence showing that Michelle B. ever followed up with any of these referrals or attended her follow-up appointment, and Michelle B. has not claimed that she underwent further treatment. (*See generally*, ECF 12, Tr. 49-73.)

Accordingly, the ALJ did not err in formulating Michelle B.'s RFC. The ALJ provided a thorough review of the medical evidence and gave a clear explanation for her

determination that Michelle B. could perform some light exertional work.  *See Fargnoli*, 247 F.3d at 41.  Thus, substantial evidence exists to support the RFC determination.

### C.    The ALJ Did Not Err by Failing to Develop the Record.

Finally, Michelle B. contends that the ALJ erred in failing to develop the record. (ECF 12 at 6.)  Specifically, Michelle B. argues the ALJ erred by failing to order a consultative examination or medical expert.  Her argument is not well taken.

While an ALJ has a duty to develop a full and fair record, *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995), the burden "lies with the claimant to develop the record regarding [ ] her disability because the claimant is in a better position to provide information about [ ] her own medical condition."  *Money v. Barnhart*, 91 F. App'x 210, 215 (3d Cir. 2004) (citing *Bowen*, 482 U.S. at 146 n.5 and 20 C.F.R. § 416.912(a)).  The ALJ must eliminate evidentiary gaps that prejudice the claimant's case and resolve any material conflict or ambiguity in the evidence, *Money* 91 F. App'x at 216, but she is not required to "search out all relevant evidence which might be available, since that would in effect shift the burden of proof to the government."  *Hess v. Sec'y of Health, Educ. & Welfare*, 497 F.2d 837, 840 (3d Cir. 1974).

Michelle B. has been represented by counsel since filing her SSI application. (Tr. 96-99, 100.)  "[A] claimant represented by counsel is presumed to have made [her] best case before the ALJ . . . ."  *Vivaritas v. Comm'r of Soc. Sec.*, 264 F. App'x 155, 158 (3d Cir. 2008) (citing *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007)); *see also Myers v. Berryhill*, 373 F. Supp. 3d 528, 539 (M.D. Pa. 2019).  As Michelle B. was represented by

counsel during the entire administrative process, the ALJ was entitled to assume that she was making the strongest possible case for benefits.

If Michelle B. believed that additional medical opinion evidence or evaluations would help her prove her disability claim, she was in the best position to secure that evidence, and it was her burden to do so. *See Money*, 91 F. App'x at 215; 20 C.F.R. § 416.912(a). She had ample opportunity to proffer additional medical evidence to the ALJ before her claim was decided and, with counsel's assistance, could have sought further medical opinions regarding any functional limitations from ambulation difficulties and/or mental impairments. Instead, her attorney represented to the ALJ that she would have a complete record to base her determination on after receipt of outstanding medical records from Penn Presbyterian Medical Center and Penn Pain Medicine Center Valley Forge, so the ALJ kept the record open for three weeks after the hearing for those outstanding records. (Tr. 45-47.) Notably, in Michelle B.'s initial appeal of the ALJ's decision, her counsel maintained that the evidence supports a finding of disabled and did not mention insufficient evidence or an underdeveloped record. (Tr. 278-80); *see Torres v. Barnhart*, 139 F. App'x 411, 413 (3d Cir. 2005) ("Claimant cannot saddle the ALJ with his own perspective regarding the [evidence] and then accuse [the ALJ] of failing to develop the record . . . ."); *see also* 20 C.F.R. § 416.1450(d). Moreover, Michelle B.'s attorney did not object to anything in evidence, nor did she request assistance from the ALJ in obtaining any additional records or examinations. (*See* Tr. 45-46.)

In fact, the record shows that Michelle B. neglected to provide evidence throughout the disability proceeding. In the initial level disability determination explanation, the state agency physician noted that the "available [medical evidence] is insufficient since it lacks evidence . . . and [a] detailed current exam . . ." and the state agency psychologist also stated that the "evidence is insufficient . . . because the evidence necessary for a full psychological evaluation is not available." (Tr. 86-87.) Michelle B. then received a letter explaining that, under the law, she is responsible for providing evidence to support her claim and that, despite requests for her to provide additional evidence, she had not done so. (Tr. 113.) Similarly, at the reconsideration level explanation, the Agency informed Michelle B. that there was insufficient evidence to establish that her medical conditions would prevent her from engaging in substantial work activity because she "did not cooperate with the claim development process." (Tr. 124.) She did not complete the required Adult Function Report and Work History questionnaires and or respond to "subsequent contact attempts by mail and phone." (*Id.*)

The decision to seek a consultative examination or medical expert testimony is within the ALJ's "sound discretion." *Thompson v. Halter*, 45 F. App'x 146, 149 (3d Cir. 2002). An ALJ is authorized to obtain a consultative examination *if* there remains information needed to make a disability determination—"such as clinical findings, laboratory tests, a diagnosis or a prognosis"—which cannot be obtained from the medical record. 20 C.F.R. § 416.919a. Such an examination may be requested when the Commissioner is not presented with the information necessary to make a decision or is presented with inconsistent information.  20 C.F.R. § 416.919(a)-(b).  However, here the

record contained all of Michelle B.'s relevant treatment records. While the medical evidence may not compel the conclusion Michelle B. desires, it is not inconclusive. Rather, Michelle B. did not offer a single opinion that she was disabled or had any work-related functional limitations from any of her treating sources, even though it was her burden to provide evidence of her disability.  *See* 20 C.F.R. § 416.912(a); *see also Lane v. Comm'r of Soc. Sec.*, 100 F. App'x 90, 95 (3d Cir. 2004) (finding "very strong evidence" that a claimant is not disabled where none of her treating physicians opined that she was unable to work) (citing *Dumas v. Schweiker*, 712 F.2d 1545, 1553 (3d Cir. 1983)).  Because the record contained sufficient evidence for the ALJ to make a disability determination, a consultative medical examination was not necessary to enable the ALJ to make her disability decision.  Thus, there is no abuse of discretion in the ALJ's decision not to order one and the ALJ adequately developed the record.

IV.    **CONCLUSION**

Upon review, the ALJ's decision and the underlying record show that her evaluation of Michelle B. is supported by "such relevant evidence as a reasonable mind might accept as adequate to support" her determination. *Biestek*, 587 U.S. at 103.  Mindful of the Supreme Court's directive that the threshold for "evidentiary sufficiency is not high," remand for further consideration is not required.  *Id.*

An appropriate Order follows.